# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| MONOCOQUE DIVERSIFIED INTERESTS, LLC, § <br> Plaintiff, § <br> § <br> v. § <br> § <br> USA JET AIRLINES, INC., RAMBLER § <br> AIR, LLC, ARCTIC-ON-DEMAND, LLC, § <br> ROADRUNNER TRANSPORTATION § <br> SYSTEMS, INC., ASCENT GLOBAL § <br> LOGISTICS HOLDINGS, INC., and § <br> ACTIVE AERO GROUP, INC., § <br> Defendants. § | Civil Action No. 1:21-cv-00956-RP |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Monocoque Diversified Interests, LLC files this its Second Amended Complaint, filed within twenty-one days after Defendants' various Motions to Dismiss and/or to change venue. In support of its Complaint against USA Jet Airlines, Inc., Rambler Air, LLC, Arctic On-Demand, LLC, Roadrunner Transportation Systems, Inc., Ascent Global Logistics Holdings, Inc., and Active Aero Group, Inc. (sometimes collectively referred to herein as "Defendants"), Plaintiff would respectfully show the Court the following:

## PARTIES

1.  Plaintiff Monocoque Diversified Interests, LLC ("MDI") is a Texas limited liability company, headquartered in Austin, Travis County, Texas. MDI is in the business of buying, selling, servicing, and leasing aviation equipment and services. MDI is a citizen of Texas and Alaska, as its owners are citizens of these states.

2. USA Jet Airlines, Inc. ("USA Jet") is a Delaware corporation registered to do business in Texas, who has been served and appeared. USA Jet Airlines is a division of the Active Aero Group and a FAA certified airline that operates a fleet of cargo aircraft reserved exclusively for Arctic On-Demand, LLC.

3. Rambler Air, LLC ("Rambler") is an Alaska limited liability company who has been served and appeared.

4. Arctic-on-Demand, LLC ("Arctic On-Demand") is an Alaska limited liability company who has been served and appeared.

5. Roadrunner Transportation Systems, Inc. ("Roadrunner") is a Delaware corporation who has been served and appeared.

6. Ascent Global Logistics Holdings, Inc. ("Ascent") is a Delaware corporation who has been served and appeared. Ascent has offices throughout the United States including one in 100 E Royal Lane, Suite 275 Irving, Texas 75039.

7. Active Aero Group, Inc. ("Active Aero Group") is a Delaware corporation who has been served and appeared.

**VENUE**

8. Venue is proper in the Western District of Texas as a substantial part of the events giving rise to the claim occurred here. 28 U.S.C. §1391(b)(2). Additionally, the November 28, 2018, Mutual Non-Disclosure Agreement between MDI and USA Jets, in contemplation of the transaction that is the heart of this dispute, set mandatory venue in Austin, Travis County, Texas "for any action to enforce rights, duties or obligations." All services under the Consulting Agreement between MDI and USA Jets were performed in Austin, Texas. *See section 1.3 of*

*General Terms.* In accordance with section 1.13 of the General Terms, venue is in Austin, Travis County, Texas.

## JURISDICTION

9. This Court has dominant authority over Cause Number 3:21-cv-00235-JMK, *Rambler Air, LLC v. Monocoque Diversified Interests, LLC*, in the United States District Court for the District of Alaska, as it was filed on October 22, 2021, after the original state court case was filed.

10. This Court has dominant jurisdiction of Cause Number 3AN-21-8178CI, *Arctic On-Demand, LLC v. Monocoque Diversified Interests, LLC,* in the District Court for the State of Alaska, Third Judicial District at Anchorage, also filed October 22, 2021. The issues in the three cases arise from the same transaction. *See Employers Ins. of Wausau v. Fox Entm't Grp.*, 522 F.3d 271, 274-75 (2d Cir. 2008).

## FACTUAL BACKGROUND

11. Defendants Ascent, Active Aero Group, Rambler and Arctic On-Demand, are related party entities, owned or controlled by Roadrunner, and were established or utilized to engage with MDI to enter into the Alaska aviation industry. USA Jet is also owned or controlled by Roadrunner. Roadrunner is the entity at the top of the pyramid of companies that entered into a relationship with MDI and MDI was initially promised an equity ownership in the Alaska Aviation operation so that MDI would use its management and operations platform and skills to contribute to the development of the Alaska Aviation platform. One officer of Roadrunner, Chris Jamroz, told MDI in Austin, Texas, that he, Chris Jamroz, makes the decisions for all of the Defendants. Plaintiff MDI is an aviation management company which provides, among other

services, consulting services, management services, and equipment technical services to the aviation industry. Mary Alice Keyes and Leo Nadeau are the founders and equity partners of MDI.

12. Defendants Ascent, Active Aero Group, USA Jet, Arctic On-Demand, and Rambler are related entities of Ascent Global Logistics, Inc., a Delaware corporation, currently structured as follows:



Defendant Roadrunner previously owned 50% of Ascent and 100% of Active Aero Group. In or about August, 2020, Roadrunner completed a spin-off of the other Defendants, and operates today as an independent company. However, at the time relevant to the events giving rise to this case, Roadrunner controlled all of the Defendant entities, including Arctic On-Demand and Rambler. Discussions about the transactions at issue in this case began in Detroit, but most of the planning and negotiating occurred in Austin, Travis County, Texas.

13. On or about November 28, 2018, MDI entered into a Mutual Non-Disclosure Agreement with USA Jet, and subsequently on or about April 14, 2019, MDI and USA Jet entered into a Consulting Agreement. Under the terms of the Consulting Agreement, MDI was to provide consulting services for the modernization and replacement of USA Jet's aircraft fleet.

14. Roadrunner and Ascent are logistics companies that provide shipping and transportation to many industries and indicated to MDI an interest in expanding into the aviation industry. Mr. Nadeau, an owner of MDI, is an Alaska resident. In or about 2018, Mr. Nadeau and Ms. Keyes proposed the concept of an Alaska-based aircraft logistics management company, to Active Aero Group's President Tom Stenglein and Vice President of Sales Tony Facciolla (who was formerly Vice President of Sales at Roadrunner and at times relevant to this case, Senior Vice President of Sales at Ascent), and to Ascent's Vice President of Operations, David Camden.  (At this time, Active Aero was still a subsidiary of Ascent and thus, was controlled by Roadrunner.) MDI would be an equity owner and would manage the assets of the new Alaska operation and assist with the introduction of this new player to persons and entities in Alaska. Active Aero Group was a cargo broker, and it needed an airline with which to work in Alaska, in order to assure that it could provide logistic services to customers in Alaska.  MDI's proposal provided that exact solution: a strategic alliance between MDI and Ascent and its subsidiaries, working together to identify, negotiate, and implement cargo transportation services between shippers and carriers, utilizing an existing software program system owned by Active Aero Group and the relationships and skills of MDI.

15. Ms. Keyes and Mr. Nadeau relied on the representations of employees and representatives of Active Aero Group (namely Mr. Stenglein and Tom Breen, Active Aero Group's Vice President of Finance and Purchasing) and Ascent (Mr. Camden) that Active Aero Group and Ascent would enter into a relationship with MDI whereby each party would own one-third of the proposed logistics company, with the remaining one-third to be owned by an airline operating in Alaska, and proceeded to develop the proposed company.  Without Ascent and Active Aero Group's representations, made to MDI in Texas, MDI would not have constructed the business

opportunity, utilized its resources and relationships, nor offered it participation to any of the Defendants.

16. Based on Active Aero Group and Ascent's representations to MDI, the parties met in Las Vegas, Nevada in or about November, 2018 along with Everts Air Cargo ("Everts"), an airline with the necessary certifications to operate an airline in Alaska. Together, MDI, Active Aero Group, Ascent, and Everts created the business plan based on Mr. Nadeau and Ms. Keyes' concept, for what would become Arctic On-Demand and Rambler. The ownership structure contemplated was to be one-third ownership to MDI, one-third ownership to Ascent, and one-third ownership to Everts.

17. Representatives from Active Aero Group, Everts, and MDI subsequently met in Austin, Texas in January, 2019 to finalize the agreement. However, at that point Everts demanded 51% ownership instead of the contemplated one-third ownership. Ascent would not agree to invest the necessary funding to get started because of Everts' demands. Everts eventually withdrew from the agreement, and that specific deal did not go forward.

18. Following Everts' withdrawal and the collapse of the first contemplated transaction, representatives of Ascent returned to Austin to try to reestablish the deal and to engage MDI to source another airline to support Arctic On-Demand. Ascent required that MDI forgo the plan for MDI to be an equity partner in the Alaska aviation logistics service. Instead, the parties created the concept that would eventually be implemented through the Master Services Agreements between MDI and Rambler and MDI and Arctic On-Demand, two entities to be created by Roadrunner or its subsidiaries to engage in the new Alaska operations. The concept was that the amounts to be paid to MDI under the Master Services Agreements for MDI's part in conceptualizing and implementing the Alaska plan were to approximate the one-third profits

originally contemplated by the parties in the original concept of the transaction. The concept was memorialized in the Master Service Agreements with Arctic On-Demand and Rambler by agreement to pay to MDI $12,000,000.00 if the agreements were terminated or not renewed. On March 4, 2020, the Master Service Agreements were executed by the parties to those agreements. The Master Services Agreements were not only fully negotiated by the parties, but all parties were represented by well-known, capable attorneys of their own choice.

19. In or about early 2020, Alaska's largest regional airline, Ravn [sic] Air Group Inc., was on the brink of declaring bankruptcy due to the COVID pandemic; the several airlines it owned would become available for purchase once Ravn filed. MDI suggested to Ascent and Active Aero Group that it could acquire one of those airlines, Hageland Aviation Services, Inc. ("Hageland"), to operate the aircraft necessary to conduct the new Alaska cargo business. Through the efforts of MDI, Hageland, an operating Alaska airline, then under the protection of the Bankruptcy Court in Alaska, was acquired by Active Aero and was to be the replacement airline to Evert to facilitate the new aviation logistics business in Alaska. The acquisition of Hageland took more time than planned by the Defendants and MDI but was eventually completed. At that same time Arctic On-Demand and Rambler were formed by the Defendants to facilitate operations in Alaska. Arctic On-Demand would be a service enterprise that booked shipments for its customers and Rambler would be the name-holder of the new airlines, utilizing the Aircraft Operating Certifications of Hageland. MDI was to be the manager of the aircraft owned by Rambler. Had the transaction closed when anticipated, Hageland would have been eligible for $16,000,000.00 in stimulus funds under the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act Funds"). But the transaction did not close in time to collect the first round of CARES Act Funds, and Rambler lost

the second round of CARES Act Funds because it lacked Department of Transportation authority to operate.

20. Once the CARES Act Funds were lost, Ascent and USA Jet lost interest in the deal. Mr. Breen was involved in negotiating all of the contracts. Mr. Camden and Amy Swek, currently the VP of Business Operations and Property Management for USA Jet, worked to exclude MDI from further discussions about the concept originally developed by Mr. Nadeau and Ms. Keyes.

21. Even so, MDI continued to perform its obligation by working with Active Aero Group to complete the collaboration that resulted in the formation of Rambler and Arctic On-Demand. At the request of Active Aero and Rambler, MDI acquired three aircraft for the benefit of the new Alaska airline and at the request of Active Aero and Rambler, MDI had those aircraft modified so that they could be flown in Alaska. The cost of those modifications was approximately $600,000.00, which MDI incurred and paid for the benefit of Active Aero and Rambler. Evidence of the agreement is the deposit by Rambler of $600,000.00 with MDI pursuant to Amended Letters of Intent to lease the aircraft once modified.

22. Active Aero Group established its subsidiary Rambler in or around August 2020, to facilitate the purchase of Hageland's assets. On or about September 25, 2020, MDI entered into the Managed Services Agreements with Rambler and Arctic On-Demand. Rambler Air would operate the aircraft; Arctic On-Demand would manage the logistics in Alaska; and MDI, with access to, and the right to utilize Active Aero Group's software system free of charge, would manage logistics and customer service support, employment of a Divisional Manager in Alaska, back-office support in Texas including accounting, credit, billing, collections, and reporting, as well as owning the physical aircraft.

23. Without the efforts of Ms. Keyes and Mr. Nadeau, Active Aero Group would not have been able to acquire Hageland's assets, establish Rambler, and establish Arctic On-Demand.

24. Active Aero Group's acquisition of Hageland was completed in or around November 2020, and Active Aero Group began operating Hageland under the fictitious business name "Rambler Air." In reliance on Active Aero Group's representations, Mr. Nadeau worked to locate the certified pilot employees to operate Rambler, as required by the Federal Aviation Administration's Part 119 certification requirements. An MDI employee, Mark Williams, spent nearly a year organizing the aircraft records in order to satisfy the Federal Aviation Administration requirements. Under Mr. Nadeau's supervision, MDI employees re-wrote the aircraft manuals, completed audits, and generally ensured that the aircraft could pass the Department of Transportation certification. Ultimately, neither Rambler or Hageland could operate as a certificated airline in Alaska because the Defendant entities were owned and controlled by entities not wholly owned by U.S. Citizens and could not qualify for Air Operating Certification required by the Department of Transportation to fly in the United States. MDI had no opportunity to obtain the necessary approvals and certifications for all aircraft, pilots, and other employees necessary to operate because it was not the control person. Subsequently, MDI offered to purchase the equity of Rambler from Defendants and MDI's offer was roundly "rejected" by all of the Defendants through Chris Jamroz at an unscheduled and surprise meeting in Austin, Texas.

## The "Buy-Out Payment"

25. The Master Services Agreements between MDI and Rambler and Arctic On-Demand each contain a "Buy-Out Payment" provision, requiring each to pay MDI a cumulative payment of $12,000,000.00 for "termination" of the agreements without renewal.

26. After the Master Service Agreements between MDI, Rambler, and Arctic On-Demand were signed and Department of Transportation non-approval of Airline Operating Certification, Mr. Nadeau received a telephone call from Mr. Stenglein acting on behalf of the Defendants, who claimed that those Master Service Agreements were "too one-sided." His issue was with the buy-out clause that if the parent company, Ascent, sold the assets, then MDI would receive a $12,000,000.00 fee. The $12,000,000.00 "Buy-Out Payment" was originally calculated as the amount MDI was anticipated to generate from the five-year term of each of the two contracts and agreed to as a protection for MDI for an early contract "termination." Mr. Stenglein and Chris Jamroz told Mr. Nadeau that they wanted to sell the whole company, but the buy-out provision was preventing the sale. MDI discussed converting the buy-out clause to an equity position in Arctic On-Demand, but Mr. Stenglein and Mr. Jamroz discarded that idea. Ultimately Mr. Stenglein told Mr. Nadeau that they intended to "mothball" the company for five years and make it go dormant to avoid paying MDI the $12,000,000.00 fee. Mr. Jamroz, on behalf of all Defendants, threatened that MDI would either buy the company for $5,000,000.00 in 45 days or they would close the company, not terminate MDI, and not pay MDI its $12,000,000. MDI refused either alternative but did propose an alternative in a formal Letter of Interest to Defendants, that would resolve all of the operating problems in Alaska. Acting through Chris Jamroz, Defendants soundly rejected that offer by MDI.

27. In response to MDI's refusal to forego the $12,000,000.00 "Buy-Out Payment" under the two Master Services Agreements, the Defendants combined and conspired to shut down all Alaska operations, transfer or sell the assets of Rambler and Arctic On-Demand, and make spurious claims about MDI to employees of Rambler and Arctic On-Demand, all with the intent and purpose to tortiously interfere with MDI's contract rights under the USA Jet Consulting

Agreement, the Rambler Master Services Agreement, and the Arctic On-Demand Master Services Agreement, by making it impossible for MDI to perform the services it agreed to provide, as no assets remain to be managed.  An employee of Arctic On-Demand, possibly under the direction of Chris Jamroz, then stole the MDI-owned aircraft operating records. After a criminal complaint was filed by MDI, the records were returned to MDI in Alaska.

28. The conspiracy included all of the acts to assure non-payment of a fully negotiated benefit for work already performed, including but not limited to  terminating all of the employees hired by  Rambler and Arctic On-Demand, but not terminating the contract with MDI.  Now, there are no employees or assets owned by the Defendants Rambler or Arctic On-Demand, for MDI to manage. MDI's agreements with Rambler and Arctic On-Demand have been *effectively terminated.*  Defendants also took all these actions that tortiously interfere with MDI's contracts with USA Jet, Rambler, and Arctic On-Demand, to deprive MDI of its $12,000,000.00 "Buy-Out Payment" and to deprive MDI of its opportunity to perform its obligations under the  Master Service Agreements and the Consulting Agreement with USA Jet. All of the wrongful actions of the Defendants have been orchestrated from the top down and implemented by Chris Jamroz, the stated Chairman of the Board of Ascent, a subsidiary of Roadrunner.

29. These actions were apparent when Mr. Jamroz paid a visit to Ms. Keyes in Austin. Mr. Jamroz told Ms. Keyes that he represented all of the Defendants and was the Chairman of the Board of Ascent.  Mr. Jamroz attempted to coerce Ms. Keyes to agree to forego the $12,000,000.00 due to MDI.  Additionally, USA Jet breached its covenants pursuant to a Mutual Non-Disclosure Agreement and Consulting Agreement between USA Jet and MDI by divulging information about MDI that it learned and received pursuant to the Mutual Non-Disclosure Agreement and Consulting Agreement, in support of the planned action to interfere with the contracts by and

between MDI and Rambler and MDI and Arctic On-Demand. USA Jet has also breached its Consulting Agreement with MDI by engaging in discussions and negotiations for the purchase and sale of its aircraft assets without engaging MDI in those discussions or negotiations as agreed to in the Consulting Agreement with MDI. All Defendants were aware of the Mutual Non-Disclosure Agreement and Consulting Agreement by and between USA Jet and MDI and conspired to have USA Jet breach that agreement as well.

30. On or about Sunday, September 12, 2021, senior officers and representatives of Roadrunner and Active Aero Group went to Alaska and informed employees of Rambler and Arctic On-Demand that all Alaska operations were being terminated, all employees terminated, and all assets sold or transferred from Rambler and Arctic On-Demand. They did not tell MDI that the relationships between MDI, Rambler, and Arctic On-Demand were terminated, but they effectively (and fraudulently) terminated the Master Services Agreements by eliminating Rambler and Artic On-Demand; MDI cannot provide management services to entities that have no services or assets to manage. MDI performed every one of its obligations under the Master Services Agreements and the Consulting Agreement. In contrast, Defendants breached the parties' agreements, triggered the "Buy-Out Payments" due to MDI, refused to comply with their obligations under the Master Services and Consulting Agreements, and left MDI no choice but to seek the Court's intervention.

## CAUSES OF ACTION

### TORTIOUS INTERFERENCE WITH CONTRACT RIGHTS

31. Paragraphs 9 through 30 are hereby repeated and incorporated herein to the extent necessary to support this cause of action.

32. As demonstrated by the visit from Mr. Jamroz, Mr. Stenglein, Mr. Camden, and Mr. Breen, the Defendants, all affiliates of one another and under direction from the top down, were each aware of the contracts between MDI, Rambler, Active Aero Group and USA Jet, including the $12,000,000.00 "Buy-Out Payment " obligation. In addition to the communications with Mr. Nadeau, Mr. Jamroz communicated this to Ms. Keyes, thus establishing that all Defendants acted in concert to tortiously interfere with the contract rights of MDI, to deprive MDI of the benefits of those contracts and to enrich one or more Defendants, all of whom are affiliated entities, effectively constructively terminating the contracts with both Rambler and Arctic On-Demand and triggering the "Buy-Out Payments" thereunder and then refusing to honor their commitment. In addition, Rambler induced MDI to acquire and repair three (3) aircraft and then refused to conduct any operations. These aircraft remain at maintenance, repair, and operations facilities in Florida and Arizona.

33. MDI has been damaged by the tortious interference with its contract rights by the Defendants, in the minimum amount of $12,000,000.00.

## BREACH OF CONTRACT AS TO USA JET

34. Paragraphs 9 through 33 are hereby repeated and incorporated herein to the extent necessary to support this cause of action.

35. As noted above, USA Jet breached the Consulting Contract and the Mutual Non-Disclosure Agreement and proximately caused MDI significant damages. In addition, USA Jet breached its contract with MDI by discussing and negotiating buying and selling assets without permitting MDI to participate. MDI seeks an accounting of all transactions in which USA Jet participated during the period April 4, 2019, to the present. MDI seeks recovery of its actual,

incidental, and consequential damages. MDI further seeks recovery of its reasonable and necessary attorneys' fees pursuant to section 38.001 *et seq.* of the Texas Civil Practice and Remedies Code.

## CONSPIRACY

36. Paragraphs 9 through 35 are hereby repeated and incorporated herein to the extent necessary to support this cause of action.

37. The actions of the Defendants constitute civil conspiracy. As noted by Mr. Jamroz, as Chairman of the Board of Ascent Global Logistics, he was representing all Defendants in the later interactions with MDI, pursuant to direction from Roadrunner. Further, as noted by the discussions between Mr. Nadeau and Ms. Swek, Mr. Camden, Mr. Stenglein, and others, the Defendants were at all times working together, first to create the deal, then to take advantage of MDI and then, when MDI refused to capitulate, Defendants developed a scheme to close the Alaska operation in a manner to avoid triggering the buy-out due to MDI.

38. MDI has been damaged by the tortious interference with its contract rights by the Defendants, in the minimum amount of $12,000,000.00.

## FRAUDULENT INDUCEMENT

39. Paragraphs 9 through 38 are hereby repeated and incorporated herein to the extent necessary to support this cause of action.

40. One or more of the Defendants made representations about their intention to participate in these various transactions to Nadeau and Keyes. When Ms. Swek, Mr. Camden, Mr. Stenglein, and Mr. Jamroz made these representations to MDI, Defendants knew they were false and that they intended to structure a transaction in which MDI would not receive its $12,000,000.00 "Buy-Out Payment." MDI relied on these representations to their detriment and

entered into the various agreements. Their reliance was reasonable, as the model created by MDI would have been successful.

41. The damages sustained by MDI include the benefit of the bargain, i.e. the $12,000,000.00 "Buy-Out Payment." In addition, MDI seeks its consequential and incidental damages and exemplary damages.

### NEGLIGENT MISREPRESENTATION

42. Paragraphs 9 through 41 are hereby repeated and incorporated herein to the extent necessary to support this cause of action.

43. As noted previously, Defendants made certain misrepresentations to MDI in a transaction in which they had a pecuniary interest. They made these misrepresentations to guide MDI and did not exercise reasonable care or competence in obtaining or communicating the information. MDI justifiably relied on Defendants' representations which proximately caused injury to MDI.

44. MDI seeks recovery of its actual, incidental, and consequential damages and exemplary damages.

### QUANTUM MERUIT AS TO RAMBLER

45. Paragraphs 9 through 44 are hereby repeated and incorporated herein to the extent necessary to support this cause of action.

46. As noted previously, all Defendants, including but not limited to Rambler, accepted, and received the benefit of MDI's acquisition and renovation of three aircraft. MDI justifiably relied on Defendants' representations and performed the necessary aircraft purchases and renovations.

47. MDI seeks recovery from all Defendants, of its actual damages of $600,000.00, incidental, and consequential damage, and its attorney's fees pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code.

### EXEMPLARY DAMAGES

48. Paragraphs 9 through 47 are hereby repeated and incorporated herein to the extent necessary to support this cause of action.

49. The actions of the Defendants were malicious, extreme, and egregious, for which MDI seeks exemplary damages in the minimum amount of $36,000,000.00.

### ATTORNEYS' FEES

50. Paragraphs 9 through 49 are hereby repeated and incorporated herein to the extent necessary to support this request for attorneys' fees.

51. USA Jet has breached its obligations under the Mutual Non-Disclosure Agreement with MDI. USA Jet has breached its obligations under the Mutual Non-Disclosure Agreement and Consulting Agreement. These breaches required that MDI retain the services of Richie & Gueringer, P.C. to prosecute its claims against all Defendants.

52. The Mutual Non-Disclosure Agreement and the Consulting Agreement recites both applicable Texas law and provides for attorneys' fees to the prevailing party in litigation.

53. Therefore, pursuant to section 38.001 of the Texas Civil Practice and Remedies Code and the terms of the Agreement, MDI seeks its attorneys' fees, jointly and severally. from all Defendants or at least individually from USA Jet.

### VENUE SHOULD REMAIN IN THE WESTERN DISTRICT OF TEXAS

54. Paragraphs 9 through 53 are hereby repeated and incorporated herein to the extent necessary to support this request for venue in the Western District of Texas.

55. In the event this case is not remanded for lack of diversity, then it should remain in the Western District of Texas.

56. All Defendants except USA Jet seek to transfer venue to Delaware; however, Delaware has no interest in the claims in this lawsuit. Furthermore, it is not judicially economical to try the same issues in two courts – Texas and Delaware. There is a risk of inconsistent results.

57. As noted in the Facts section, the misrepresentations occurred in Texas; MDI is a Texas company who has been wronged by the misrepresentations and fraud in which the Defendants engaged. Some of the contracts stipulate Texas law and Austin, Travis County, Texas as the proper venue. Texas has a greater interest in protecting its citizens than Delaware who has no nexus whatsoever to the issues in this case. No negotiations occurred in Delaware, no misrepresentations occurred in Delaware, the companies were not going to operate in Delaware.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff Monocoque Diversified Interests, LLC prays that, upon the trial of this matter, it recover jointly and severally from the Defendants:

a. Its actual, incidental and consequential damages as outlined above;

b. Exemplary damages in the amount of not less than $36,000,000.00;

c. MDI's reasonable and necessary attorneys' fees at trial and on appeal to the Court of Appeals or Fifth Circuit and, if this case is remanded, to the Texas Supreme Court;

d. All amounts MDI would have received under the constructively terminated contracts;

e. Prejudgment and post-judgment interest; and

f. All other relief, whether at law or in equity, to which this Court deems MDI is entitled.

Dated:  November 12, 2021

                                    Respectfully submitted,

                                    RICHIE & GUERINGER, P.C.

                                    By: */s/ Sheldon E. Richie*
                                          Sheldon E. Richie
                                          State Bar No. 16877000
                                          srichie@rg-austin.com
                                          Katherine J. Walters
                                          State Bar No. 00785174
                                          kwalters@rg-austin.com
                                          100 Congress Avenue, Suite 1750
                                          Austin, Texas 78701
                                          512-236-9220 telephone
                                          512-236-9230 facsimile

                                    **ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2021, I caused the above and foregoing document to be filed electronically with the Clerk of Court via the CM/ECF system which will send notification of such filing to the following parties:

**For Defendants USA Jet Airlines, Inc., Rambler Air, LLC, Arctic On-Demand, LLC, Ascent Global Logistics Holdings, Inc., and Active Aero Group, Inc.**
Matthew R. Stammel (mstammel@velaw.com)
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3900
Dallas, Texas 75201-2975

Michelle K. Arishita (marishita@velaw.com)
Lindsey C. Laielli (llaielli@velaw.com)
VINSON & ELKINS LLP
2801 Via Fortuna, Suite 100
Austin, TX 78746-7568


**For Defendant Roadrunner Transportation Systems, Inc.**
David P. Blanke (dblanke@ebbklaw.com)
Ewell Brown Blanke & Knight, LLP
111 Congress Avenue, 28th Floor
Austin, Texas 78701


    /s/ *Sheldon E. Richie*
    Sheldon E. Richie