IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MONOCOQUE DIVERSIFIED INTERESTS, LLC, | § § § | No. 1:21-cv-956-DAE |
| *Plaintiff,* | § § | |
| vs. | § § § | |
| USA JET AIRLINES, INC., | § § § | |
| *Defendant.* | § § | |

<u>ORDER ON MATTERS OF CONTRACTUAL INTERPRETATION</u>

Before the Court is Defendant USA Jet Airlines, Inc.'s ("Defendant" or "USA Jet") Bench Brief on Contractual Interpretation Legal Matters to Be Decided by the Court ("Bench Brief"), filed on August 6, 2025.  (Dkt. # 135.) Plaintiff Monocoque Diversified Interests, LLC ("Plaintiff" or "MDI") filed a response on August 20, 2025.  (Dkt. # 149.)  Defendant replied on August 26, 2025.  (Dkt. # 150.)

The Court held a pretrial conference in the above-captioned case on August 28, 2025.  After careful consideration of the parties' briefs and the relevant law, the Court makes the following findings.  First, with respect to whether the exclusivity provision of the parties' Consulting Agreement applies to the sourcing of items other than aircraft and engines, the Court finds that it does not.  Second, as

1

to whether the exclusivity provision applies to USA Jet's sales of aircraft and engines, the Court holds that it does not. Third, the Court finds that the exclusivity provision does not restrict USA Jet's ability to purchase or lease aircraft that it sourced itself. Fourth, with respect to whether the term "third party" in the confidentiality provision excludes "affiliates," the Court finds that it does. Finally, as to whether the exclusivity provision of the Consulting Agreement covers confidential information provided by MDI under the distinct Master Service's Agreements, the Court reserves its ruling.[1]

## BACKGROUND

On September 13, 2021, Plaintiff MDI filed this case against several Defendants,[2] including USA Jet, based on a series of agreements regarding MDI's provision of consulting and management services to Defendants' airline operations. (Dkt. # 26 at 1.) On March 2, 2022, the Court granted a Motion to Transfer MDI's tort claims against all Defendants to the District of Delaware, and severed those

---

[1] At the pretrial conference on August 28, 2025, this Court provided the parties with its current "intended" ruling on this matter. However, the Court also carefully qualified this by advising the parties that this was *not* a final ruling as the Court intended to take another hard look at the law and the documents and the Court would issue its actual ruling in a written order. This order differs in some respects from the intended ruling announced from the bench following this Court's further review.

[2] The original Defendants included Rambler Air, LLC ("Rambler"), Arctic-On-Demand, LLC ("Arctic"), Roadrunner Transportation Systems, Inc., Ascent Global Logistics Holdings, Inc., and Active Aero Group, Inc ("former Defendants"), in addition to USA Jet.

claims from MDI's breach of contract claim against USA Jet – the sole remaining claim before this Court.  (Dkt. # 29.)

Plaintiff MDI is an aircraft broker and aviation consulting company with expertise in the aviation industry including, but not limited to, sourcing and selecting aircraft for fleets, optimizing cargo conversions, providing technical expertise to optimize aircraft monetization, complying with regulations, and advising on and building business plans with aviation clients.  (Dkt. # 118 at 2.)

Defendant USA Jet is part of a family of companies in the aviation industry that includes former Defendants Rambler Air, LLC, Arctic-On-Demand, LLC, Roadrunner Transportation Systems, Inc., Ascent Global Logistics Holdings, Inc., and Active Aero Group, Inc.  (Id.)  USA Jet is in the business of providing on-demand, premium freight shipping, and operates a fleet of aircraft and deploys those aircraft assets to deliver freight.  (Dkt. # 111 at 3.)

In 2018, USA Jet embarked on a plan to "re-fleet" its existing airplanes and enlisted Plaintiff MDI to assist in this endeavor.  (Id.)  On November 28, 2018, MDI and USA Jet entered into a Mutual Non-Disclosure Agreement ("NDA").  (Dkt. # 11 at 4.)  On April 4, 2019, USA Jet and MDI entered into the "Consulting Agreement" in which the parties agreed that MDI would "perform consulting services in the area of aircraft modernization and replacement of the current aircraft fleet of [USA Jet], including fleet planning and sourcing of aircraft

and engines" among other tasks.  (Dkt. # 118 at 3.)  In exchange, USA Jet agreed to

pay MDI: (1) for Services, a $25,000 quarterly fee from April 2019 through

January 2022; (2) for Additional Services, "reasonable fees" as agreed by MDI and

USA Jet; (3) for Sourcing, a percentage fee based on the size of the asset sourced;

and (4) a monthly fee of $4,000 per month, paid during the last two years of the

five-year contract term and after termination of the quarterly Service fee, with that

amount applied as an offset of any Sourcing Fees due.  (Dkt. # 111-5 at 4, § 1.3.)

      In its Complaint, Plaintiff MDI alleges that USA Jet breached the

NDA and the Consulting Agreement by (1) "divulging information about MDI that

it learned and received pursuant to the [NDA] and Consulting Agreement," and by

(2) "engaging in discussions and negotiations for the purchase and sale of its

aircraft assets without engaging MDI in those negotiations as agreed to in the

Consulting Agreement."  (Dkt. # 11 at 11–12.)  MDI further alleges that USA Jet

breached the Consulting Agreement by stopping the payments of the required

monthly and quarterly fees prior to the end of the pre-determined Sourcing period.

(Dkt. # 118 at 2.)

      Under the Consulting Agreement, the parties agreed regarding

"Sourcing" that MDI would be the exclusive aircraft and engine sourcing agent for

USA Jet until March 31, 2024:

> MDI will serve as the exclusive and worldwide aircraft and engine
> sourcing agent for [USA Jet] during the Sourcing Period. [USA Jet]

4

> expressly undertakes not to mandate or allow any other party to act on
> its behalf with respect to the Sourcing of aircraft during the Sourcing
> Period, and [USA Jet] shall direct all parties contacting [USA Jet]
> regarding Sourcing (including relating to aircraft leasing) to MDI.

(Dkt. # 111-5 at 12, § 1.3.)

In addition, the parties agreed to a confidentiality provision in which both parties agreed "that any and all information concerning the other party's business and/or the Services, Additional Services, and Sourcing is confidential information ('Confidential Information')."  (Id. at 15, § 1.6.)  The parties further agreed that "neither party will disclose any Confidential Information to any third party." (Id. at 15, § 1.6)

In the first quarter of 2021, USA Jet stopped paying MDI the quarterly fees outlined in the Consulting Agreement.  (Dkt. # 118 at 6.)  USA Jet also engaged in a number of purchases of aviation assets during the Consulting Agreement's Sourcing Period in which it excluded MDI from discussions and therefore did not pay MDI Sourcing fees. (Id.)

On June 10, 2024, USA Jet moved for summary judgment, arguing that MDI's breach of contract claim fails as a matter of law because: (1) it is undisputed that USA Jet never divulged Confidential Information *about* MDI, as alleged in the Complaint; (2) it is undisputed that USA Jet did not engage another *third-party agent* to source aircraft or engine assets on its behalf; and (3) MDI improperly seeks to add new breach of contract theories in its Response to the

Motion that were not pled in the Complaint, related to the nonpayment of fees. (See Dkts. ## 111 at 2; 121 at 1–2.)

On March 21, 2025, the Court entered an Order granting in part and denying in part Defendant's Motion for Summary Judgment. (Dkt. # 129.) In its Order, the Court found there were genuine issues of material fact with respect to (1) whether USA Jet disclosed Confidential Information to third parties in violation of the confidentiality provision of the Consulting Agreement; and (2) whether USA Jet breached the exclusivity provision of the Agreement by failing to "direct all" inquiries it received from third parties to MDI. (Id. at 7–9, 10–12.) Additionally, the Court found that MDI had presented evidence that USA Jet breached the Consulting Agreement by stopping the payments of monthly and quarterly fees prior to the end of the pre-determined period, precluding summary judgment on the claim related to unpaid fees. (Id. at 17.) However, the Court did grant summary judgment as to Plaintiff's claims that (1) USA Jet breached the exclusivity provision by failing to adhere to the "Fleet Proposal," an agreement that pre-dated the fully-integrated Consulting Agreement, and that (2) USA Jet breached the Agreement by failing to pay MDI a higher sourcing fee in connection with a purchase of aircraft from Delta Material Services, LLC ("Delta"). (Id. at 13–14.)

On August 6, 2025, Defendant USA Jet filed a Bench Brief on Contractual Interpretation Legal Matters to Be Decided by the Court. (Dkt. # 135.)

6

In its brief, USA Jet contends that certain aspects of the exclusivity and
confidentiality provisions are unambiguous and so the Court should rule on them
as a matter of law.  (Id. at 2.)

LEGAL STANDARD

Whether a contract is ambiguous is a question of law for the Court.
Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc., 334
F.3d 423, 431 (5th Cir. 2003) (applying Texas law); Dynegy Midstream Servs.,
Ltd. P'ship, v. Apache Corp., 294 S.W.3d 164, 168 (Tex. 2009).  When a contract's
language can be given a certain or definite legal meaning, then the court must
construe it as a matter of law.  Barrow-Shaver Res. Co., v. Carrizo Oil & Gas, Inc.,
590 S.W.3d 471, 479–80 (Tex. 2019).  Indeed, the Court "errs when it submits an
unambiguous contract to the jury rather than construing it as a matter of law."  Id.
at 480.

However, when a contract's language is ambiguous, the meaning
becomes a question for the jury.  Id. at 480.  A contract is not ambiguous merely
because the language is unclear or because the parties disagree over its meaning.
Bd. of Regents of Univ. of Texas Sys. v. IDEXX Lab'ys, Inc., 691 S.W.3d 438, 443
(Tex. 2024).  Rather, contractual language is ambiguous if it is "subject to two or
more reasonable interpretations."  Id.

"Even if a contract is unambiguous as a matter of law, a court 'may

7

still consider the surrounding facts and circumstances' as an 'aid in the construction of the contract's language.'" Barrow-Shaver Res. Co., 590 S.W.3d at 483 (quoting First Bank v. Brumitt, 519 S.W.3d 95, 110 (Tex. 2017)).  Although the Court may not consider evidence that "contradicts, varies, or adds to the terms of an unambiguous agreement," the Court may consider evidence of surrounding circumstances that "inform…the contract text.'" First Bank, 519 S.W.3d at 109–10.  "[B]ut the parties may not rely on extrinsic evidence 'to create an ambiguity or to give the contract a meaning different from that which its language imports.'" First Bank, 519 S.W.3d at 109–10 (quoting Anglo-Dutch Petroleum, Int'l v. Greenberg Peden, P.C., 352 S.W.3d 445, 451 (Tex. 2011)).

<u>DISCUSSION</u>

In its Bench Brief, Defendant asks that the Court resolve five issues regarding the interpretation of the exclusivity and confidentiality provisions of the Consulting Agreement.  (Dkt. # 135 at 2.)  Specifically, Defendant argues that (1) the exclusivity provision does not apply to the sourcing of items other than aircraft and engines; (2) the exclusivity provision applies only to USA Jet's purchase or lease of aircraft and engines, not its sale of aircraft and engines; (3) the exclusivity provision does not restrict USA Jet's ability to purchase or lease aircraft or engines that USA Jet sourced itself; (4) the confidentiality provision bars disclosure of confidential information to third parties but not to affiliates; and (5) the

confidentiality provision does not cover information provided by MDI under separate agreements entered into with two of USA Jet's affiliates. (Dkt. # 135 at 2.) The Court will address each argument in turn.

When interpreting a written contract, the primary concern is to give effect to the parties' intentions as expressed in the writing. Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am., 341 S.W.3d 323, 333–34 (Tex. 2011). Courts must "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." Id. (internal citations omitted). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." Seagull Energy E&P, Inc. v. Eland Energy, Inc., 207 S.W.3d 342, 345 (Tex. 2006) (citing Coker v. Coker, 650 S.W.2d. 391, 393 (Tex. 1983)).

Contractual terms must be given their plain, grammatical meaning unless doing so would "clearly defeat" the intentions of the parties. Barrow-Shaver Res. Co., 590 S.W.3d at 479. Additionally, when construing a contract, the traditional rules of construction favoring consistent usage, disfavoring surplusage, and using the plain meaning of undefined terms apply. Mosaic Baybrook One, L.P. v. Simien, 674 S.W.3d 234, 257 (Tex. 2023). If a contract does not define a term, courts may turn to a dictionary to discern the meaning of commonly used terms. In

re Davenport, 522 S.W.3d 452, 457 (Tex. 2017).  However, in interpreting

contracts, courts may not "rewrite agreements to insert provisions parties could

have included or to imply restraints for which they have not bargained."

ExxonMobil Corp. v. Elec. Reliability Servs., Inc., 868 F.3d 408, 415 (5th Cir.

2017) (applying Texas law).

I.    Sourcing of Items Other Than Aircraft and Engines

   In its Brief, Defendant first argues that MDI's right to serve as USA

Jet's exclusive sourcing agent applies only to the sourcing of aircraft and engines,

not to the sourcing of other items.  To support its argument, Defendant emphasizes

that the provisions in the Consulting Agreement that define the scope of this right

refer only to "aircraft" or "aircraft and engines," not to any "other" items.  (Dkt.

# 135 at 4.)  The first provision, in Section 1.1, states:

> In addition to the Services and the Additional Services, if applicable, [USA
> Jet] hereby retains MDI to be its exclusive and worldwide ***aircraft*** sourcing
> agent to source aircraft for [USA Jet]'s fleet, as further described in in [sic]
> Appendix "C" (the "**Sourcing**").

(Dkt. # 135-1 at 2, § 1.1) (first emphasis added).

   The second provision, in Appendix C, at Section 1.3, states:

> MDI will serve as the exclusive and worldwide ***aircraft and engine*** sourcing
> agent for [USA Jet] during the Sourcing Period. [USA Jet] expressly
> undertakes not to mandate or allow any other party to act on its behalf with
> respect to the Sourcing of ***aircraft*** during the Sourcing Period, and [USA Jet]
> shall direct all parties contacting [USA Jet] regarding Sourcing (including
> relating to aircraft leasing) to MDI.

(Id., at 11, § 1.3) (emphases added).

This language, Defendant argues, is unequivocal in that MDI was to be USA Jet's exclusive agent for aircraft and engines and nothing else.  (Dkt. # 135 at 4.)  While MDI could potentially earn fees for sourcing items other than aircraft and engines, there is nothing in the contract that indicates USA Jet was required to use MDI to source those items. (Id. at 4–5.)

In response, Plaintiff points to a table in Section 1.3 of the Consulting Agreement, which calculates sourcing fees that MDI could earn for various items purchased by USA Jet.  (Dkt. # 149 at 6.)  The table includes a fee for "any other individual items purchased (engines, etc.)."  (Id.)  To read the contract to not cover "other" items, MDI contends, would render the terms "other," "items," and "etc." superfluous.  (Id.)

The table at issue, however, says nothing about exclusivity or MDI being the exclusive agent for those items, Defendant argues.  (Dkt. # 150 at 7.) Defendant reiterates that simply because MDI *could* earn a fee if it did in fact source "other" items for USA Jet does not mean USA Jet was *required* to use MDI to source those items or that MDI was to be USA Jet's exclusive agent for those "other items."  (Id.)  Therefore, because this table does not mention exclusivity and the provisions that do dictate the scope of MDI's rights to serve as the exclusive sourcing agent for USA Jet mention only aircraft and engines, any argument that

USA Jet was prohibited from sourcing "other items" without using MDI as its sourcing agent contravenes the unambiguous language of the contract. (Dkts. ## 135 at 5, 150 at 7.)

The Court finds that, under the plain language of the contract, the exclusivity provision applies only to the sourcing of aircraft and engines. While the Consulting Agreement does provide for MDI to earn a fee for "any other individual items purchased," there is no suggestion on the face of the contract that MDI was to be USA Jet's *exclusive* agent for all other related items. On the contrary, every time exclusivity is discussed in the Consulting Agreement, it refers to aircraft and engines only. (See Dkt. # 135-1 at 2, 11–12.) The only reference to "other items" is found in the section providing that USA Jet is to pay MDI "sourcing fees." (Id. at 3.) The table provides:

Any Additional Services provided by MDI to Customer will incur reasonable fees as approved by Customer and MDI at the time such Additional Services are agreed to by the parties (the "**Additional Service Fees**").

In addition to the Service Fees and Additional Service Fees (if applicable), Customer shall pay MDI:

(i) a sourcing fee based on the following table:

| | | |
|---|---|---|
| a) | Cost of purchase of aircraft > $1,000,000 | 3.5% |
| b) | Cost of purchase of aircraft < $1,000,000 | 4% |
| c) | Any other individual items purchased (engines, etc) | 3% |

(ii) $4,000.00 per month beginning on the Services Expiration Date and ending at the expiration of the Sourcing Period (the "**Monthly Fees**"); provided, however the Monthly Fees shall be applied towards the Sourcing Fees as an offset to the extent that Customer leases or purchases any aircraft or engines throughout the contract period for which MDI sources such purchase.

(Dkt. # 135-1 at 3, § 1.3.) (highlighting added)

This table makes no mention of exclusivity. (Id.) To read in exclusivity for the provision of all other related items would "imply [a] restraint[] for which [the parties] have not bargained." ExxonMobil Corp., 868 F.3d at 415. Accordingly, the Court agrees with Defendant that the exclusivity provision does not apply to the sourcing of "other items."

The Court notes, however, that in so holding, MDI is not precluded from recovering its fee for any "other individual items" it did in fact source for USA Jet.

II.    Sale of Aircraft and Engines

With respect to the second issue raised, Defendant USA Jet argues that the exclusivity provision applies only to USA Jet's purchase or lease of aircraft and engines, not to its sale of aircraft assets. (Dkt. # 135 at 5.) The exclusivity provision states that MDI is to be the "exclusive and worldwide aircraft and engine sourcing agent" for USA Jet. (Dkt. # 135-1 at 11, § 1.3.) The term "sourcing," Defendant contends, refers only to purchasing or leasing. (Dkt. # 135 at 6.)

To support its argument, Defendant first notes that the "sourcing fee" provided under the contract is based solely on the "purchase" of aircraft or other items. (Dkt. # 135-1 at 3, § 1.3.) Second, all the services described in the relevant appendix describe the purchase or lease of aircraft and engines, not the sale. (Id. at

11–12.)  Finally, the parties named the fees MDI would earn "sourcing fees" rather than "transaction fees" or "divestiture fees."  (Dkt. # 135 at 6.)  Therefore, as all provisions must be read together harmoniously and given effect, the only possible construction of the Agreement is that "sourcing" refers only to the purchase or lease of aircraft and engines.  (Id.)

Plaintiff MDI, on the other hand, contends that the sourcing provision applies to sales as well as purchases.  (Dkt. # 149 at 6.)  In support of this assertion, Plaintiff points to one section of the Consulting Agreement that uses the word "transaction."  (Dkt. # 149 at 6–7.)  This section, Section 1.4 of Appendix C, provides that USA Jet would be responsible to MDI for a percentage of the "transaction value" if USA Jet "consummated any transaction" relating to any MDI-identified asset.  (Dkt. # 149 at 6–7.)  MDI argues that to interpret the contract to only cover purchases would force the word "transaction" to express something other than its plain, ordinary, and natural meaning.  (Id. at 7.)

Defendant counters that when the term "transaction" is read in context, it can only be understood to refer to USA Jet purchasing or leasing assets. (Dkt. # 150 at 8.)  Indeed, when read as a whole, the section Plaintiff cites actually supports the argument that "sourcing" refers only to the purchase or lease of aircraft and engines.  (Id.)

The Court agrees with Defendant.  The term "sourcing" as it is used in

14

the Agreement unambiguously refers only to the purchase or leasing of aircraft and engines, not the sale.  When reading the Consulting Agreement in its entirety, the Agreement reveals that the parties contemplated MDI's role as one where MDI would identify and help procure aircraft and engines for USA Jet's fleet.  (See Dkt. # 135-1 at 2–4, 6–7, 11–12.)  The Appendix that specifically deals with Sourcing, Appendix C, repeatedly refers to the "lease," "purchase," and "acquisition" of aircraft assets.  (Id. at 11–12.)  The "sourcing fees" chart includes only items purchased, not items sold.  (Id. at 3.)  Indeed, there is not a single reference or even allusion to USA Jet selling any aircraft or engines in connection with the contract with MDI.  (See Dkt. # 135-1.)

Plaintiff's only argument to the contrary is unpersuasive.  Plaintiff's focus on the term "transaction," ignores the context within which this term is discussed.  While contractual terms must be given their plain meaning, they must also be construed in the context in which they are used.  Bd. of Regents of Univ. Texas Sys., 691 S.W.3d at 443.  Section 1.4 of Appendix C discusses a specific situation: it states that if, within 180 days of the expiration of the Sourcing Period, USA Jet "consummates any transaction" with any of the entities identified on the list provided by MDI, USA Jet will owe MDI a fee.  (Dkt. # 135-1 at 11–12, § 1.4.)  However, as Defendant points out in its Reply, the same section clarifies that this list provided by MDI is a list of "potential lessors/sellers."  (Id.)  Read in context,

then, the term "transaction" refers to USA Jet *buying* or *leasing* aircraft or engine from an entity on the list. Therefore, looking at the Agreement as a whole and reading the terms in context, the exclusivity provision applies only to the purchase and leasing of aircraft assets, not the sale.

III.    USA Jet's Ability to Source Aircraft and Engines Itself

Next, Defendant asserts that the exclusivity provision does not restrict USA Jet's ability to source aircraft and engines itself. (Dkt. # 135 at 7.) The exclusivity provision lists two restrictions. The first restriction bars USA Jet from engaging "any other party" other than MDI "to act on its behalf" in sourcing aircraft and engines. (Dkt. # 135 at 7.) The second restriction, the "direct all" requirement, requires that USA Jet "direct all parties contacting [USA Jet] regarding Sourcing." (Id.) Neither restriction, however, limits USA Jet's ability to source aircraft or engines from sellers by itself. (Id.) Reading the exclusivity provision as a whole, then, indicates that USA Jet may purchase or lease aircraft or engines directly from a third party so long as (1) USA Jet does not engage "any other party to act on its behalf," and (2) USA Jet initiates the contact rather than the other way around. (Id. at 8.) The plain language of the provision does not permit an alternative interpretation, according to Defendant. (Id. at 7–8.)

Plaintiff argues that to read the contract as Defendant suggests would render the entirety of the contract meaningless. (Dkt. # 149 at 7–8.) The essential

purpose of the Consulting Agreement was for MDI to be the "exclusive" sourcing agent of assets for USA Jet.  (Id. at 7.)  The language of the contract is not conditional; it does not state that MDI is to be USA Jet's exclusive agent *if* USA Jet decides to use an agent, but rather that MDI *is* its exclusive agent.  (Id.)  To interpret the contract in a way that permits USA Jet to act as its own sourcing agent would thus render the contract meaningless, contravening an elementary contract interpretation principle.  (Id. at 7–8, citing Universal C.I.T. Credit Corp. v. Daniel, 243 S.W.2d 154, 158 (Tex. 1951).)

Moreover, Plaintiff argues that Defendant's focus on the "direct all" requirement is misguided.  (Dkt. # 149 at 7–8.)  The "direct all" requirement instructs USA Jet how to address a particular situation.  (Id. at 8.)  It would be redundant for USA Jet to direct itself to MDI for sourcing, and so it was not written that way.  (Id.)  Instead, the Agreements states repeatedly that MDI was to serve as USA Jet's exclusive sourcing agent.  (Id.)  The plain meaning of this term is that USA Jet was to use MDI and only MDI for the sourcing of aircraft and engines.  (Id.)  This meaning is bolstered by the ample testimonial evidence that USA Jet entered into the Agreement with MDI because USA Jet did not want their staff expending resources sourcing aircraft.  (Dkt. # 149 at 7, n.2.)[3]

---

[3] Plaintiff makes an additional argument that the Court already addressed this issue in its Order granting in part and denying in part Defendant's Motion for Summary Judgment.  (Dkt. # 149 at 3.)  Plaintiff misunderstands the Court's Order.  In

In its Reply, Defendant contends that Plaintiff's arguments do not alter the unambiguous language of the exclusivity provision.  (Dkt. # 150 at 9.)  First, the exclusivity provision has express restrictions, and those express restrictions do not limit USA Jet's ability to source aircraft by itself.  (Id. at 9–10.)  Second, Defendant argues that Plaintiff's reliance on extrinsic evidence of the parties' intent is improper.  (Id. at 9; citing U.S. Polyco, Inc. v. Tex. Cent. Bus. Lines Corp., 681 S.W.3d 383, 385 (Tex. 2023) ("[L]ike all other considerations beyond the contract's language and structure, parties' 'disagreement' about their intent is irrelevant to whether that text is ambiguous.").)  The unambiguous language of the contract makes clear there is no restriction on USA Jet's ability to source aircraft assets independently, and extrinsic evidence of intent cannot change that outcome.  (Id. at 9–10.)

The Court agrees with Defendant and finds that the Consulting Agreement does not bar USA Jet from sourcing aircraft or engines itself, so long as it does not (1) engage another party to do so on its behalf or (2) fail to direct all parties contacting USA Jet regarding sourcing to MDI.

---

finding a genuine issue of material fact as to whether the exclusivity provision was breached, the Court held that there was a factual question regarding whether USA Jet failed to "direct all" inquires it received from third parties to MDI.  (Dkt. # 129 at 12.)  In so holding, the Court did not address Defendant's contention that the exclusivity provision does not cover purchases initiated by USA Jet itself without the assistance of another third-party agent acting on its behalf.  (See id. at 10–13.)

In construing contractual provisions, "Courts may not rewrite the parties' contract, nor should courts add to its language." In re Davenport, 522 S.W.3d at 457. In this case, the Consulting Agreement places two explicit restrictions on USA Jet's sourcing of aircraft and engines. (Dkt. # 135-1 at 11, § 1.3.) These are the only restrictions placed on USA Jet with respect to exclusivity. (Id. at 11–12.) It would have been simple for the parties to include language requiring that USA Jet include MDI in *any* negotiations regarding sourcing, regardless of who contacts who. However, the parties did not do so. To impose a further restriction on USA Jet, without express language dictating it, would "add to [the contract's] language," In re Davenport, 522 S.W.3d at 457, and would "imply [a] restraint[] for which [the parties] have not bargained," ExxonMobil Corp., 868 F.3d at 415.

Plaintiff's contention that the contract is rendered meaningless in the absence of such a restriction is without merit. While the essential purpose of the Agreement is for MDI to be USA Jet's "exclusive" agent, it does not follow that "exclusive" necessarily prohibits USA Jet from taking actions independently. Cf. Wade Oil & Gas, Inc. v. Telesis Operating Co., Inc., 417 S.W.3d 531, 537 (5th Cir. 2013) (citing Alba Tool and Supply Co., Inc. v. Indus. Contractors, 585 S.W.2d 662, 664 (Tex. 1979) (distinguishing between "exclusive agency" and "exclusive right to sell" in the real estate context, the former giving the principal

the right to sell without the involvement of the agent)).  If the parties intended to

place additional restrictions on USA Jet's ability to enter into contracts with other

entities on its own initiative, they would have done so.

        Moreover, while courts may consider the "surrounding 'facts and

circumstances' as an 'aid in the construction of the contract's language,'" courts

may not do so when the evidence "contradicts, varies, or adds to the terms of an

unambiguous written agreement." Barrow-Shaver Res. Co., 590 S.W.3d at 483

(internal citations omitted).  In other words, "extrinsic evidence cannot be used to

show that the parties probably meant, or could have meant, something other than

what their agreement stated."  First Bank, 519 S.W.3d at 110.

        Here, the contractual language is unambiguous.  Accordingly, the

Court may not consider extrinsic evidence that contradicts or adds to the

unambiguous written agreement.  Barrow-Shaver Res. Co., 590 S.W.3d at 483.

The evidence Plaintiff points to regarding USA Jet's motivations for entering into

the Consulting Agreement would do just that; it would write a restriction into the

contract that is simply not present.

        However, even if the Court were to consider the evidence Plaintiff

cites to, its determination would not change.  In its Response, Plaintiff refers to the

testimony of one of MDI's owners, Leo Nadeau.  (Dkt. # 149 at 7, n.2.)  In his

deposition testimony, Mr. Nadeau stated that USA Jet "did not want their staff

wasting their time going out sourcing aircraft." (Dkt. # 149-1 at 7.) He further testified that the arrangement between USA Jet and MDI was intended so that if "somebody came to [USA Jet]" and "was trying to sell them [an aircraft], they were told to hand that over to MDI and let MDI go ahead and vet the aircraft and see if it was worth pursuing." (Id.)

This testimonial evidence belies the very position MDI seeks to advance. Mr. Nadeau's own testimony suggests that in coming to their agreement, the parties contemplated that MDI be involved when *other parties* contacted USA Jet, not the other way around. Accordingly, even if the Court considered the extrinsic evidence offered by Plaintiff, that evidence only bolsters the finding that the contractual language unambiguously does not bar USA Jet from sourcing aircraft or engines itself nor does it require USA Jet to involve MDI in negotiations USA Jet initiated on its own.

However, the Court clarifies that this conclusion does not prevent MDI from asserting that transactions USA Jet entered into during the Sourcing period were not truly independent. MDI may of course present evidence that USA Jet used the information and reports furnished by MDI and subsequently contacted entities directly, bypassing MDI and avoiding payment of the agreed-upon fee. Such arguments are not foreclosed by the Court's ruling today.

IV.    The Meaning of "Third Party"

      As to the fourth issue raised, Defendant contends that the confidentiality provision does not prohibit the sharing of confidential information with USA Jet's "affiliates." (Dkt. # 135 at 9.) The confidentiality provision at issue, Section 1.6 of Appendix D of the Consulting Agreement, states that neither party will disclose any Confidential Information to "any third party." (Dkt. # 135-1 at 14, § 1.6.) Defendant notes that while "third party" is not defined with precision in the contract, the following section, Section 1.7, differentiates between "third parties" and "affiliates," stating that "MDI shall be free to perform and provide services…to MDI, MDI's affiliates, and third parties." (Dkt. # 135 at 9.) In order to harmonize and give effect to all the provisions of the contract so none are rendered meaningless, then, the term "third party" must be understood as excluding "affiliates." (Dkt. # 135 at 9, citing Seagull Energy, 207 S.W.3d at 345.) If the Court were to interpret "third party" to include "affiliates," the reference to "affiliates" in Section 1.7 would be rendered surplusage, violating an established contract interpretation principle. (Dkt. # 135 at 10, citing Mosaic Baybrook, 674 S.W.3d at 257; In re Davenport, 522 S.W.3d at 457.)

      Furthermore, Defendant assets, courts have recognized that in common legal writings, the term "third party" is "uniformly used in a manner that excludes 'affiliates.'" (Dkt. # 135 at 10, quoting In re Wesco Holdings, Inc., No.

23-90611, 2025 WL 354858, at *21 (Bankr. S.D. Tex. Jan. 15, 2025) (collecting

cases).) Thus, as the ordinary meaning of "affiliate" is a "corporation that is

related to another corporation by shareholdings or other means of control; a

subsidiary, parent, or sibling corporation," Defendant argues that the Consulting

Agreement does not prohibit USA Jet from sharing information with a parent,

subsidiary, or sibling entity. (Dkt. # 135 at 11–12, citing Dell Techs. Inc. v. TiVo

Corp., 392 F. Supp. 3d 704, 713 (W.D. Tex. 2019).)

   In response, Plaintiff contends that Defendant's interpretation is

unreasonable because the Consulting Agreement was made between MDI and USA

Jet, not with any of USA Jet's affiliates, and the Agreement makes that clear. (Dkt.

# 149 at 8.) Section 1.5 of Appendix D of the Consulting Agreement states that

"any reports, proposals, or other relevant documents furnished by MDI in relation

to the Services, Additional Services, and Sourcing are strictly for use of *Customer*

in furtherance of the purposes of this agreement." (Dkt. # 149 at 8–9, citing

Consulting Agreement, App. D § 1.5) (emphasis added). "Customer" is

unequivocally defined in the Agreement as USA Jet, exclusive of any of its

affiliates. (Dkt. # 149 at 8–9.) Reading the contract as Defendant suggests, then,

ignores Section 1.5, which also confers duties and obligations on the parties

regarding information provided pursuant to the Consulting Agreement. (Id.)

   Moreover, Plaintiff argues, Section 1.6 is unambiguous in that the

information was to be kept between the two parties to the Agreement, which were

defined exclusively as MDI and USA Jet.  (Dkt. # 149 at 10–11.)  Thus, when this

section is harmonized with the Agreement as a whole, "third party" unambiguously

refers to the opposite of party, namely any entity beyond MDI and USA Jet.  (Dkt.

# 149 at 11.)[4]

Defendant argues in its Reply that even when considering Section 1.5

of Appendix D, the result is the same.  (Dkt. # 150 at 11–12.)  While Section 1.5

does state that only "Customer" may "use" the documents furnished by MDI, it

also provides that "neither MDI nor Customer will copy, publish, or otherwise

disseminate to third parties" any documents furnished by MDI in relation to the

services provided under the contract.  (Id.)  The question of the proper

interpretation of "third parties," then, must still be resolved.  (Id.)  And because

"words used in one sense in one part of a contract are, as a general rule, deemed to

have been used in the same sense in another part of the instrument, where there is

nothing in the context to indicate otherwise," the term "third party," as used in

Section 1.6 or 1.7, must be understood to exclude "affiliates."  (Id. at 13, citing

_____

[4] Plaintiff again asserts that the Court has already ruled with respect to this
question.  (Dkt. # 149 at 3–4.)  Plaintiff's assertion is incorrect. In its Order, the
Court held that a genuine issue of material fact exists as to whether USA Jet
breached the confidentiality provision because MDI provided evidence that MDI's
advice was sent to an outside consultant.  (Dkt. # 129 at 9.)  In making this
determination, the Court did not reach the argument that "third parties" does not
include "affiliates."  (See id.)

Farmers Grp., Inc. v. Geter, 620 S.W.3d 702, 709 (Tex. 2021).)

Here, the Court finds that the term "third party" as used in the parties'
Consulting Agreement unambiguously excludes "affiliates." Although the
Consulting Agreement does not define the term "third party, Section 1.7 of
Appendix D of the Consulting Agreement differentiates between "affiliates" and
"third parties." (Dkt. # 135-1 at 14, § 1.7.) Considering the contract as a whole so
as to ensure that no provision is rendered meaningless thus requires a construction
of "third party" that excludes "affiliates." Italian Cowboy, 341 S.W.3d at 333; In re
Davenport, 522 S.W.3d at 457 ("The Court must read contractual provisions so
none of the terms of the agreement are rendered meaningless or superfluous."); see
also Farmers Grp., 620 S.W.3d at 709 ("Words used in one sense in one part of a
contract are, as a general rule, deemed to have been used in the same sense in
another part of the instrument, where there is nothing in the context to indicate
otherwise."). Reading Section 1.6 in conjunction with Section 1.5 does not alter
this result as Section 1.5 still restricts USA Jet from sharing information with
"third parties." (Dkt. # 135-1 at 14, § 1.5.) Accordingly, the term "third party" as
used in the Consulting Agreement unambiguously excludes "affiliates."

V.    Information Provided by MDI Under the MSAs

Finally, Defendant contends that the confidentiality provision does not
include information provided by MDI under the Master Services Agreements

related to starting an Alaskan airline and logistics business.  (Dkt. # 135 at 12.)

Several years after entering into the Consulting Agreement with USA Jet, MDI

entered into two separate agreements, the Master Services Agreements ("MSAs"),

with two of USA Jet's affiliates, Rambler Air, LLC ("Rambler") and Arctic-on-

Demand, LLC ("Arctic").  (Id.)  These agreements related to starting an Alaskan

airline and logistics business and contained merger clauses stating that the MSAs

superseded and replaced any and all other prior agreements between the parties.

(Id. at 12–13.)

Defendant asserts that much of Plaintiff's evidence supporting its

confidentiality claim involves correspondence between USA Jet and its affiliates

related to the Alaskan business venture.  (Id. at 12.)  As this subject matter is

covered by the MSAs solely and not the Consulting Agreement, Defendant asks

that the Court find as a matter of law that the confidentiality provision in the

Consulting Agreement does not encompass any information provided by MDI

related to the MSAs.  (Id. at 13–14, citing Human Power of N Co. v. Bryan, 2023

WL 6522627, at *4 (W.D. Tex. Aug. 15, 2023) ("[a] merger clause extinguishe[s]

those prior agreements and their attendant obligations").)

Plaintiff responds that this issue is one for the finder of fact as it does

not involve a question of contractual interpretation but instead a question of

whether particular information is covered by the Consulting Agreement.  (Dkt.

26

# 149 at 11.)  As such, it must be put to the jury.  (<u>Id.</u>)

In its Reply, Defendant argues that the interpretation of a merger clause, however, is a question for the Court.  (Dkt. # 150 at 14.)  Therefore, Defendant asks the Court to find that any confidentiality obligation that might have existed under the Consulting Agreement regarding information provided by MDI related to the Alaskan business was no longer operative once the MSAs were signed.  (<u>Id</u>. at 14–15.)

The Court reserves its ruling on this question.  Whether specific information relates to the Alaskan business venture and thus arose from the Master Services Agreements rather than the Consulting Agreement depends on the specific evidence at issue.  Accordingly, the Court reserves its ruling at this juncture.

<u>CONCLUSION</u>

For the reasons above, the Court makes the following findings.  First, with respect to whether the exclusivity provision of the parties' Consulting Agreement applies to the sourcing of items other than aircraft and engines, the Court finds that it does not.  Second, as to whether the exclusivity provision applies to USA Jet's sales of aircraft and engines, the Court holds that it does not.  Third, the Court finds that the exclusivity provision does not restrict USA Jet's ability to purchase or lease aircraft that it sourced itself.  Fourth, with respect to whether the term "third party" in the confidentiality provision excludes "affiliates,"

the Court finds that it does.  Finally, as to whether the exclusivity provision of the Consulting Agreement covers confidential information provided by MDI under the distinct Master Service's Agreements, the Court reserves its ruling.

**DATED**: Austin, Texas, September 2, 2025.

_____
David Alan Ezra
Senior United States District Judge